EXH. 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------X

JANINA LAGUERRE,

                    Plaintiff,

                v.

NATIONAL GRID USA,

                    Defendant.

-------------------------------------------------------------------X

Index No.

**SUMMONS**

Plaintiff designates Kings
County as the Place of Trial
Based on Defendant's Residence

**TO THE ABOVE-NAMED DEFENDANT:**

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with the summons, to serve a notice of

appearance on the Plaintiff's Attorney within 20 days after the service of this summons, exclusive

of the day of service, and in the case of your failure to appear or answer, judgment will be taken

against you by default for the relief demanded in the complaint.


Dated: New York, New York
       December 26, 2020

                    ADVOCATES FOR JUSTICE,
                    CHARTERED ATTORNEYS
                    *Attorneys for Plaintiff*

                    By:_____*Arthur Z. Schwartz*_____
                          Arthur Z. Schwartz
                    225 Broadway, Suite 225
                    New York, New York 10007
                    (212) 285-1400/917-923-8136
                    Email: aschwartz@afjlaw.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------X

JANINA LAGUERRE,

                           Plaintiff,

                v.

NATIONAL GRID USA,

                           Defendant.

-----------------------------------------------------------------X

Index No.

**COMPLAINT**

JANINA LAGUERRE, by her undersigned counsel, as and for her Complaint, alleges as follows:

## INTRODUCTION

1.     This is a suit alleging the failure of an employer to accommodate a disability as required by the New York State, and New York City Human Rights Laws.

## PARTIES

2.     Plaintiff Janina Laguerre is an employee, as that term is defined in the New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").

3.     Defendant National Grid USA ("National Grid or NG") is an employer as that term is defined in the New York State and New York City Human Rights Laws. National Grid's offices are located at 1 MetroTech Center, Brooklyn, NY 11201. It is a gas utility which serves residents and businesses all around the Northeast.

## FACTS RELEVANT TO ALL CLAIMS

4.      Plaintiff commenced employment with National Grid in 1993 as a Meter Reader and became a Customer Service Representative ("CSR") in 1996. Plaintiff has had Lupus since 1996. Since 1996 she has worked at One MetroTech. She started as working in the Call Center at MetroTech, taking inbound calls. In 2002 she transferred to the Special Services Team in the Call Center, where she handled new accounts for businesses and multi-family dwellings, set up appointments to check high bill complaints, and took a few, non-residential calls. In 2008 she "rotated out" to the inbound work group again and shortly after that became so ill that she was out of work, not cleared to come back until 2014.

5.      In 2014 she asked to return to work with some accommodation. She asked her supervisor, Jim Modell, to be placed back in the Call Center in a less stressful job, like her old Special Services position. He refused, so she returned to work, doing inbound calls, in early 2015.

6.      In December 2015, her condition worsened, and she was advised by her physician to ask for an accommodation again. On December 1, 2015 she submitted a note asking that she be allowed to work in "a less stressful environment and work at her pace if possible, due to the fact [that] stress plays a big role in flare of lupus and fibromyalgia." Again, no meeting occurred except for one in early 2016 where she and another employee asked to go to Special Services on seniority grounds.

7.      Plaintiff was out of work several times in 2016 due to flare-ups. After one absence, on June 2, 2016, she submitted another note, where the doctor wrote "may go back to work on 6/4/2016 (needs accommodation, etc., if possible)." She got no meeting, inquiry, or accommodation. So, believing that she had been unlawfully denied an opportunity to work at home, something at least 20 or more other employees were doing at the time, all of whom were CSRs, she filed an Americans With Disability Act charge with the EEOC.

2

8.      In October 2016 Ms. Laguerre went out of work again.  On January 5, 2017 she

also submitted a new note from her physician which asked for a "work at home"

accommodation.

9.      Later in January 2017 she was called by a nurse from the National Grid Health

Services Department, Carmine Cannizzaro, who did not know that she had filed with the EEOC.

Plaintiff told him about others working from home and he said he would look into it.  She also

told that she had filed with the EEOC. Cannizzaro was sympathetic, but in the end, after email

with Modell, all he did was extend Plaintiff's leave.  No meeting with Plaintiff or further

discussion with her was scheduled.

10.      In October 2017 Plaintiff also wrote to National Grid President Ken Daly

describing her efforts to get accommodation and begging for someone to reach out to her.  No

one did.

11.      At no time before or since January 2017 has any National Grid official (except

counsel at her deposition in a federal lawsuit she filed in 2017, Laguerre v National Grid, US

District Court EDNY Docket No. 17- 6724, hereinafter "the Federal Complaint" ) engaged at an

interactive discussion with Plaintiff about what CSR work she could or could not do.

12.      Plaintiff's union, Transport Workers Union of America, Local 101, represents

most of the non-managerial, non-confidential employees of National Grid who are employed in

its Gas Operations in Brooklyn and Queens, New York.  This includes about 180 employees at

NG's Customer Call Center, which is located at NG's headquarters at One Metrotech Center, in

Downtown Brooklyn.

13.      There is no such title as "Inbound" or "Outbound" Customer Service

Representative in the Union Contract.  See Exhibit A. All CSRs can perform any one of the jobs

in the Call Center, and many other jobs around NG.  Exhibit a shows CSRs in Customer Process

Quality and Training, in Collections and Payment Processing, in Regulatory & Billing Services, Consumer Advocacy, and Customer Offices (also called District Offices) and in the Customer Assistance Center (the "Call Center").

14.     There are five subsets of CSRs in the Call Center:

a) employees who take inbound calls (mostly complaints) (this is the largest group);

b) employees who make outbound calls to schedule meter appointments and remind customers to pay bills;

c) a group which does back-office work (high bill investigations, responses to emails, new service applications), called Special Services;

d) timekeepers, who enter employee time;

e) Team Leads, who are like forewomen.

15.     CSRs work in other functions at the NG Headquarters; most jobs are related to customer accounts.  The largest is called Accounts Management Operations ("AMO").  This group of about 50 CSRs in Metrotech alone (there are two groups elsewhere) which consists of about 50 employees who focus on billing corrective matters and account updates that the CRIS computer cannot process alone.  Accounts get flagged either by the CRIS system itself or because of a consumer complaint; for example, if consumption for a particular account is out of line (too high or too small), the system will flag it.

16.     Since 2016 (two years after Laguerre returned and started asking for accommodation), some CSRs have left the group and were replaced, with their work redistributed to other CSRs.  *Id*.

17.     Starting in 2010, about 13 CSRs in AMO worked from home.  They did billing, corrective matters and account updates from home.  After September 2018, all but five of the 13

4

were reassigned to work at Metrotech.  No one ever talked to Robert Gould, the AMO Manager, about Janina Laguerre working in his group.

18.     All CSRs start their careers doing inbound call work.  Employees move to one of the other groups, either by applying for a job which is posted on the NG intranet or, sometimes, when NG asks the Union to canvass for interested people.  The Local 101 contract with NG does not require strict seniority be applied in awarding transfers.  (Going from one CSR position to another is a transfer.)  Instead, it states that "preferred consideration will be given to those employees having the necessary qualifications who are senior in service with the Company." Article IV Section 1(b)(2. This gives the NG some discretion.

19.     Furthermore, the Contract gives disabled employees many rights so that seniority is not an impediment to accommodating employees with disabilities.  A key clause is found at Article XVIII Section 1:

> In the event an employee shall become unable to perform the employee's normal duties because of a mental or physical disability, the Company will attempt but shall not be required to provide the employee with work. In any such case, an employee having fifteen (15) years or more of service, but less than twenty (20) years shall not be subject to a reduction in compensation in excess of 10% of the rate of the employee's compensation at the time the disability was incurred. In any such case, an employee having twenty (20) years or more of service shall not be subject to any reduction in the rate of the employee's compensation at the time the disability was incurred. In its attempt to provide such a disabled employee with work, the Company will not confine itself to employment opportunities in a particular area, but will seek to find a place for the employee throughout the Company

20.     Under this clause, someone with Ms. Laguerre's seniority would suffer <u>no</u> loss of pay if she were accommodated by placement in a lower paying job; plus, the Company is not limited in its job search (which it never performed for Ms. Laguerre) to the employee's department.

21.     It is important to note that the collective bargaining agreement requires the employer, National Grid, to do a job search: *"[It] will seek to find a place for the employee throughout the Company."*

22.     At no time was Local 101 asked by NG to consent to the movement of Ms. Laguerre to a position she could perform where she might have less seniority than another applicant. Nor did NG ever ask the Union to canvass employees working at home to see if anyone would give up work at home so Ms. Laguerre could work from home.

23.     At all times there was no reason why inbound calls could not be routed to a CRS's home. Prior to March 2020 NG's system rerouted calls to other Call Centers, sometimes to Syracuse, sometimes to Massachusetts, when there was an overload. The computer system, called CRIS, can be accessed online. Rerouted calls can easily be recorded. No confidential information is given during the course of such calls, such as Social Security numbers.

24.     NG also did not, prior to April 2020 explore other, less stressful clerical jobs for Ms. Laguerre elsewhere in their system. For example, in 2019, at NG's request, NG moved a CSR from the inbound call group (where she was a lead CSR, or foreperson) to a clerical position in the Canarsie Yard in Brooklyn. The employee had been fired for allegedly being involved in a criminal conspiracy to unlawfully install new meters. When she was cleared, Local 101 demanded that she be returned to work. NG did not want her to go back to the Call Center, so they found a clerical job for her elsewhere, which paid more than what Ms. Laguerre was making. When it wants to, NG can find or create jobs openings. The employee involved was not disabled.

25.     NG could also have slotted Ms. Laguerre into one of the AMO positions which have not been filled or could have worked with Local 101 to have Ms. Laguerre do a Special Services CSR job, at least part time, at home.

26.     Ms. Laguerre could also have been transferred to a job in Staten Island, which is much closer to where she lives and would be an easier commute.  Although Staten Island NG employees have a different union, they have the same pension plan, similar health insurance, and an identical pay scale.  Local 101 would not have objected to a transfer.  CSRs in Staten Island work in what are called District Offices.

27.     Plaintiff commenced her requests for a reasonable accommodation in 2014, when she was ready to return from a five-year absence due to severe consequences of lupus.  At no time over the next two years, when her illness and the lack of accommodation forced her to leave again, or after her illness abated a bit in early 2017 up until April 2020, did a single National Grid official engage her in a process to determine what she could and could not do due to her illness (except for one brief meeting in early 2016, which involved a second non-disabled employee, who like Plaintiff was looking to move to Special Services since she (and Plaintiff) had more seniority than the employees who were there), nor have they ever worked with her to shape a job that a CSR could do, be it:

a) a Call Center job which did not involve taking inbound customer complaints for more than two days per week, and might involve other responsibilities done by other parts of the Call Center Customer Service Rep group other than inbound call representatives, or a CSR job in MetroTech such as in the Account Maintenance Operations group, where more than 50 CSRs are employed;

b) a clerical job outside of the Call Center, be it in a CSR title or in some other title, in a less stressful environment (the Union CBA states that "in its attempt to provide … a disabled employee with work, the Company will not confine itself to employment opportunities in a particular area, but will seek to find a place for the employee throughout the Company.") ; or

c) job in Staten Island, where National Grid has many customers and offices.

Since Plaintiff lives in Parlin, New Jersey and previously lived in Perth Amboy, New

Jersey, which are both a short commute to Staten Island. There are also other National

Grid locations in Brooklyn where CSR work and clerical work is done which are easier to

commute to than downtown Brooklyn.

28.    Despite the supportive provisions of the Local 101 contract, which states, again,

at Article XVIII: "In the event an employee has become unable to perform the employee's

normal duties because of a mental or physical disability, the Company will attempt … to provide

the employee with work," the Defendant did not attempt to provide Plaintiff with work prior to

April 2020, when, at the demand of Local 101, it assigned  all Call Center personnel to work

from home due to the COVIS-19 pandemic.

29.    Once plaintiff filed her EEOC charge in November 2016, National Grid *ceased* all

efforts to accommodate her.  Carmine Cannizzaro, a nurse, did call Plaintiff in January 2017 to

discuss her complaint about not being allowed to work from home, but once he heard that she

had filed with the EEOC, all communication with National Grid stopped.  National Grid made no

effort to place Plaintiff until at the demand of her union and counsel it re-employed her to do

Call Center work from home in May 2020, after, despite years of denying that it was possible, all

Call Center work was modified so that employees could take calls and access the NG CRIS

system from home.

30.    On October 23, 2020 Plaintiff's Federal Complaint was dismissed on the grounds

that she was not a "qualified employee" under the Americans With Disability Act (ADA), and

that under the ADA NG had no obligation to engage in an interactive process with Plaintiff

because a) her job was an "Inbound Call Center Representative," and that NG could limit its

accommodations to inbound call work, and b) that Inbound Call Center Reps had to work at One

8

Metrotech because the technology did not exist to allow the Inbound Call center reps to work

from home. The Court refused to consider the post April 2020 restructuring of the job because it

was occurred after the NG Motion for Summary Judgment was fully submitted. In that dismissal

the Court declined to exercise jurisdiction over the NY State and NYC Human Rights Law

claims which had been included in the Federal Complaint, dismissing them without prejudice.

31.     In *Phillips v. City of New York*, 66 A.D.3d 170 (1st Dept. 2009), the Appellate

Division stated that "[t]he State HRL provides protections broader than the ADA; and the City

HRL is broader still," citing *Williams v. NYC Housing Authority*, 61 A.D.3d 62, 66 (1st Dept),

*leave to appeal denied*, 13 N.Y.3d 702 (2009).  In *Williams*, the Court cited the Restoration Act

(2005 N.Y. City Legis. Ann. at 528–535) where the N.Y. City Council, in amending the N.Y.

City Administrative Code § 8-130, stated:

> "The provisions of this title shall be construed liberally for the
> accomplishment of the uniquely broad and remedial purposes
> thereof, regardless of whether federal or N.Y. State civil and
> human rights laws, including those laws with provisions
> comparably worded to provisions of this title, have been so
> construed."
>
> "As a result of this revision, the City HRL now explicitly
> requires an independent liberal construction analysis in all
> circumstances, even where state and federal civil rights laws
> have comparable language." *Williams*, *supra*.

32.     An individualized interactive process is required by the City HRL, and its absence

represents a violation of the NYC Administrative Code § 8-107(15)(a).

33.     New York City amended its HRL again in 2018 to require as a first step that an

employer begin a "cooperative dialogue that assesses the needs of the individual."  Local Law

5931 (2018), NYC Administrative Code § 8-102.

34.     The "cooperative dialogue" is the process by which a covered entity and a person

who is entitled to or may be entitled to an accommodation under the law, engage in good faith in

a written or oral dialogue concerning the person's accommodation needs. NYC Commission on Human Rights Legal Enforcement Guidance on Discrimination on the Basis of Disability (cited as "Guidance" hereinafter) at page 53. Without this type of dialogue, individuals with disabilities and covered entities may not realize the full universe of available accommodations. Guidance at page 56. The covered entity need not provide the specific accommodation sought by the individual making the request, so long as they propose reasonable alternatives that meet the specific needs of the individual or that specifically address the impairment at issue. Guidance at page 56.

35.     To the extent that the defendant did not have such a responsibility under the ADA, there is no question but that Plaintiff was a "person with a disability" under both the State and City Human Rights Laws, a concept far broader than "qualified person with a disability" under the ADA, and NG had a clear responsibility under the NYS and the NYC Human Rights Laws to engage in a "cooperative dialogue". That cooperative dialogue *never* occurred in this case until April 2020.

36.     As a consequence of Defendant's actions, Plaintiff has been deprived of wages and benefits and has suffered severe emotional distress.

37.     Plaintiff incorporates the facts above into each cause of action set forth below.

### AS AND FOR A FIRST
### CAUSE OF ACTION

38.     By acting as aforedescribed, Defendant has violated the New York State Human Rights Law.

10

## AS AND FOR A SECOND
## CAUSE OF ACTION

39.     By acting as aforedescribed, Defendant has violated the New York City Human

Rights Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment:

a.     Awarding Plaintiff lost wages and benefits;

b.     Awarding Plaintiff $500,000 in emotional distress damages; and

c.     Awarding Plaintiff attorneys' fees and costs, and such other relief as the Court

finds equitable.

Dated:  New York, New York
        December 26, 2020

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiff*

By:   *Arthur Z. Schwartz*
        Arthur Z. Schwartz
225 Broadway, Suite 225
New York, New York 10007
(212) 285-1400/917-923-8136
Email: aschwartz@afjlaw.com

11